**Patrick E. TRIMBLE, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 35408.**

Missouri Court of Appeals,
Western District.

May 21, 1985.

Motion for Rehearing and/or Transfer
to Supreme Court Overruled and
Denied July 2, 1985.

Application to Transfer
Denied Aug. 7, 1985.

James W. Fletcher, Public Defender, Gary L. Gardner, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, P.J., and DIXON and SHANGLER, JJ.

DIXON, Judge.

Movant's counsel has filed an appeal from the denial of a Rule 27.26 motion. Movant was convicted of capital murder, and the jury imposed the death sentence. The conviction and sentence were affirmed on direct appeal by the Supreme Court. *State v. Trimble,* 638 S.W.2d 726 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983).

The trial court's order denying the Rule 27.26 motion is reversed because defense counsel was ineffective, and the cause is remanded with directions to vacate the judgment of conviction and to order a new trial.

A full statement of the facts may be found in the report of the direct appeal. In brief, movant was convicted of strangling a fellow inmate in the St. Charles County Jail. The crucial proof of the state's case came from fellow inmates. Movant contended the victim hanged himself, and a suicide note written by victim—the state contends under compulsion of movant—was in evidence. The court refused to permit argument or evidence at the punishment stage of the trial. Other facts will be stated as they bear on the issues.

It is not possible to list, with any degree of precision, the spate of issues presented on this appeal. Twenty-two points are presented. Fourteen relate to the sentencing process and eight relate to the determination of guilt. The issues will be treated under two major headings: claims of error in the findings of guilt and claims of sentencing error.

### Claims of Error in the Findings of Guilt

Movant's conviction and sentence must be vacated and a new trial ordered because of the ineffectiveness of counsel arising from an incident which occurred during the trial. The victim's mother was observed paying some money to two witnesses for the state after they had testified. In order to assess the impact of this event and its relation to the present claim of ineffective assistance of counsel in connection with the incident, further background facts are required.

The victim's death by strangulation occurred while the victim, movant, and six other individuals were confined in a county jail. The only witnesses to the actual event were movant and the other inmates. Among these witnesses were Kenneth Schwab and James Leech, who are the individuals involved in the present incident. It was the state's theory, supported by the evidence of the fellow inmates, that movant strangled the victim with a towel to keep him from telling the authorities of movant's physical and sexual abuse of the victim. Schwab testified that movant told him of the plan to kill the victim, and both Schwab and Leech furnished evidence of the victim's actual abuse and killing. Before the victim's death, he had written a suicide note. The state theorized, and evidence supported the position, that movant forced the victim to write the note. Movant's defense, supported by his testimony, was that the victim had committed suicide. When the guards arrived on the scene, movant and another inmate, Tate, were in a cell with the victim, and movant was removing a towel from the victim's neck. The medical examiner, who performed an autopsy, was unable to say whether the victim had been hanged or strangled. Two other medical witnesses gave opinions, based on the record, that the victim was strangled. The issue of movant's guilt

thus turns on the credibility of the state's inmate witnesses.

Turning now to the incident at trial, the first reference to the event was in the Rule 27.26 proceeding. Movant's grandmother and mother testified they were in the hallway outside the courtroom during a recess and observed the victim's mother give some money described as "bills" to Schwab, one of two of the state's witnesses who were seated with her. The victim's mother said, according to these witnesses, "You did a fine job. You all did well.... go out and have a good time and don't get in any trouble." Movant's mother and grandmother then approached Ron Schmitz, the investigator for the public defender, who was standing nearby. Schmitz exclaimed, "I saw that" and left to tell movant's trial counsel of the incident.

Schmitz did not testify in the Rule 27.26 hearing, but his version of the event was before the court in the following fashion. The hearing on the Rule 27.26 motion was in late September, 1983. Schmitz had been properly subpoenaed and tendered the necessary witness fees, but did not appear. When Schmitz failed to appear, the following colloquy between the court and counsel occurred:

THE COURT: Excuse me just a minute. I want to get the record straight on this. You have two witnesses, Mr. Schwab and Mr. Schmitz, that you have subpoenaed, or attempted to subpoena. The returns would indicate that you have subpoenaed them. You have indicated to me, Mr. Gardner, that you are willing to pursue the alternative of having Mr. Ross testify as to what his conversation with those people would be, rather than to have those witnesses here present. Is that correct?

MR. GARDNER: Yes. I am willing to pursue that opportunity for these reasons, Your Honor: It's my understanding that Mr. Schwab has two capias warrants out for him, non-appearance on criminal charges. That being the situation, the St. Charles County Sheriff not having found him, I doubt whether a writ of attachment would even find him. The other reason I would choose to do it this way is it would be—dispose of the case today. We are under some time restraints, and I think Mr. Ross is a trustworthy witness.

THE COURT: How about the other witness, Mr. Schmitz?

MR. GARDNER: Mr. Schmitz is subpoenaed too. I do have reason to believe that he could be found, but we might as well do it this way for the same reasons. Mr. Ross is trustworthy. His testimony would elicit what I would elicit from Mr. Schmitz himself, and *we are under the time restraints under order of the Supreme Court.* So I would choose to do it this way, if it's permissible with the Court.

THE COURT: Court will allow you to proceed in that fashion.

MR. GARDNER: All right.

MR. DALTON: State would like to make a standing objection to the testimony based on the hearsay of the witness.

THE COURT: All right.

(Emphasis added).

Ross, the investigator for the Public Defender's Office, then testified to a conversation with Schmitz, in which Schmitz confirmed that he had seen the victim's mother give the state's witnesses, Schwab and Leech, some money during a recess. Schmitz further told Ross that movant's trial counsel was immediately informed of the incident and more or less passed it off and did nothing. Movant also testified that he was present when Schmitz related the event concerning the payment of money to the state's witnesses to Palumbo, movant's trial counsel.

During the trial, evidence had been developed that the victim's parents were possessed of some considerable property. The father had appeared at the early stages of the proceeding with more than the $1,000 necessary to make the victim's bond. At the 27.26 hearing, the mother was shown to have contributed $500 to the election campaign of the sheriff of St. Charles County,

although the victim's parents lived in Tennessee.

The trial record is barren of evidence of any action of any kind by trial counsel.

Movant posits that the incident and the comment by the victim's mother, taken at face value, show the witnesses' testimony was "purchased." Movant asserts that this should invalidate the conviction and that counsel was ineffective for failing to raise the issue. The state counters by arguing that movant failed to prove that the payment was for testimony or that the witnesses even knew when they testified that the money would be forthcoming.

■ The state also challenges the proof, asserting that only hearsay supports a finding that trial counsel knew of the incident. In this assertion, the state errs in two respects. There is direct proof from movant that trial counsel was informed. Moreover, the hearing judge, acting under the stated compulsion of an order from the Supreme Court as to the need for the proceedings' termination, offered movant the right to present the matter by hearsay testimony. There can be no doubt that movant would have been entitled to a recess and an attachment for the witness, and his compliance with the hearing court's offer cannot be relied upon by the state to attack the proof offered. The hearing judge did not rule the issue upon a lack of proof or credibility, and there was no ruling on the state's hearsay objection to the evidence. The statements, in the context of this case, are not hearsay.

McCormick has defined hearsay as "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." C. McCormick, *Evidence* 2d Ed. Section 246 (1972). Although some courts have called it an exception to the hearsay rule, *State v. Ashley,* 616 S.W.2d 556, 561 (Mo.App.1981); *State v. Houston,* 607 S.W.2d 183, 185 (Mo.App. 1980); *State v. Green,* 575 S.W.2d 211, 212 (Mo.App.1978), it seems clear that "[a]n out-of-court statement is hearsay only if offered to prove the truth of the matters asserted therein." *State v. Fuhr,* 660 S.W.2d 443, 447 (Mo.App.1983); *State v. Evans,* 637 S.W.2d 62, 66 (Mo.App.1982); *State v. Harris,* 620 S.W.2d 349, 355 (Mo. banc 1981); *State v. Giannini,* 606 S.W.2d 780, 781 (Mo.App.1980); *State v. Finley,* 588 S.W.2d 229, 231 (Mo.App.1979). Succinctly stated, "[i]f the fact that a statement has been made is relevant to a material issue in the case and it is immaterial that the statement be true or false, the hearsay rule does not apply and the statement may be shown." *State v. Stufflebean,* 604 S.W.2d 737, 741 (Mo.App.1980).

Whether these statements are classified as non-hearsay or exceptions to hearsay, they are admissible. The statements were not offered to prove the truth of the matters asserted. The truth of the mother's statements is irrelevant. What is relevant is that the statements were made and that Palumbo was told they were made. The focus of the inquiry is Palumbo's knowledge of the occurrence. *State v. Harris, supra,* 620 S.W.2d at 355; *State v. Danforth,* 654 S.W.2d 912, 921 (Mo.App.1983); *See also,* McCormick, *Evidence* 2d Ed. Section 249. Palumbo's state of mind, *i.e.,* his knowledge and notice of the situation, was properly shown by this evidence.

The state also argues there is no proof that counsel did nothing. It is suggested that he may have undertaken some investigation and determined nothing further was required to be done in connection with the incident. The difficulty with this argument is that there is no affirmative evidence that he did anything, and there is some affirmative evidence that he "more or less passed it off" and did nothing. Movant attempted to obtain trial counsel's presence at the Rule 27.26 hearing, but was unable to do so. The court, in its findings on the motion, found he was not available to testify, and the court and the parties were "hampered" by that unavailability. It must be concluded that movant has shown some money was paid to the state's witnesses by the victim's mother and that movant has

shown, by the only proof available, the negative proposition that no action was taken.

The trial court's findings, as they relate to this issue, are that there was no proof of the amount of money or that the witnesses knew that the money would be paid. From those facts, the court concluded movant's constitutional rights were not impaired. The factual background, the parties' arguments, and the trial court's findings and conclusions have been set forth at length to demonstrate the fundamental issue that must be addressed. That fundamental and controlling issue is the determination of trial counsel's duty when he knew the victim's mother had paid the state's witnesses and had approved of their testimony. The issue is not whether the witnesses were bribed. The issue is that of ineffectiveness in not taking advantage of the evidence in some fashion.

■ Initially, it is axiomatic that counsel would be under an ethical constraint to report to the trial judge an event of this magnitude. The ethical question, however, is peripheral to the issue of effectiveness of counsel.

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), establishes both the mechanism and the standards for evaluating the claim of error. The inquiry involves both the determination of ineffectiveness and the presence or absence of prejudice.

■ *Strickland* was a certiorari proceeding from the en banc Eleventh Circuit (formerly Unit B of the 5th Circuit). *Strickland v. Washington*, 693 F.2d 1243 (11th Cir.1982). The State of Florida was the petitioner in the certiorari proceeding, urging that the Eleventh Circuit opinion improperly reversed and remanded for new fact finding by the District Court on the standards enumerated in the Circuit Court opinion. The Supreme Court granted certiorari to consider the standards by which to judge the actual ineffectiveness of counsel. *Strickland, supra*, 104 S.Ct. at 2063. The Supreme Court reversed the Eleventh Circuit and affirmed the District Court's finding of no ineffectiveness of counsel. The court specifically rejected the particularized standards established by the Eleventh Circuit, saying

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See *United States v. Decoster*, 624 F.2d, [196] at 208 [D.C.Cir.1976]. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause.

*Id.* 104 S.Ct. at 2065. The court articulated the standard to be applied as follows:

When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance. It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See *Michel v. New York*, 350 U.S. 91, 100–101 [76 S.Ct. 158, 163–164, 100 L.Ed. 83] (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

*Id.* This standard must be applied.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

*Id.*, 104 S.Ct. at 2066.

■ It was not "reasonable" under "prevailing professional norms" for mov-

ant's counsel to ignore the incident in question. The actions described would have been admissible in movant's case to show interest and bias on the part of the state's witnesses. There was no tactical reason not to present the evidence to the jury. The evidence did not depend for reliability on the witnesses related to movant, as Schmitz also saw and corroborated the incident. If trial counsel had elected to do so, the evidence could have been presented without calling witness Schwab, since acts and conduct showing bias and prejudice are admissible without a foundation, contrary to the rule with respect to prior statements. *State v. Beaver*, 621 S.W.2d 361, 363 (Mo. App.1981). If trial counsel had presented this evidence, the state would have been placed in a difficult position. Failure to present any evidence would have been disastrous and any explanation of the event might have sounded like a lame excuse for improper conduct. It is also possible that it might have made no difference if the jury knew all of the circumstances.

This presents the dilemma in the instant case. It is unknowable at this point what might have developed from the known facts. A whole range of possibilities exists, which might have transpired. Some would have undoubtedly affected the result. Others might not have had any effect on the proceedings. Neither party at the motion hearing offered any evidence by the victim's mother or the witnesses that sheds any light on which of the several possibilities might have been disclosed on further inquiry. It might be argued that, in this circumstance, the movant cannot complain since he made no effort to further develop the proof. There is sound reason to reject that argument in the present case. The situation is closely analogous to the situation of jury misconduct where separation or communication with the jury occurs. When there has been a showing of juror misconduct, which may have affected the verdict, the burden is upon the party receiving the verdict to present evidence to show that the misconduct did not result in prejudice. Presented here is evidence of an event on its face showing witness misconduct, which would have resulted in a due process violation of the most serious nature. When the proof presents a possibility that such serious prejudice may have existed, the movant should not be held to a burden of presenting any evidence other than the event itself. The state was aware of the exact nature of the claim before the hearing and, since it involved persons who were state's witnesses at the underlying murder trial, it would normally be expected that any readily acceptable innocent explanation would have been presented.

■ The evidence on its face is very nearly sufficient to constitute the offense of tampering with a witness. Section 575.-270 RSMo Supp.1984 proscribes conferring a benefit on a witness with the purpose of causing the witness to testify falsely. The amount or nature of the benefit is immaterial. It is the purpose that renders the conduct unlawful. The remark attributed to the victim's mother, "You did a fine job. You all did well," is certainly suggestive of a prior purpose on her part.

The application of this portion of the *Strickland* analysis relates to an objective standard of measurement, that of "prevailing professional norms." *Strickland, supra*, 104 S.Ct. at 2065. The inquiry thus centers upon the norm of professional conduct in the given circumstances. So considered, complete inaction is not reasonable, nor appropriate. Counsel was not reasonably effective, under prevailing professional norms, in ignoring the incident and taking no action.

Under the *Strickland* test, the second inquiry must be the determination of the prejudicial effect of the specific act or omission constituting the ineffectiveness. The appropriate test for the finding of prejudice, as enunciated by the *Strickland* court, is that there must be a reasonable probability that the error would have affected the result. A reasonable probability is defined as, "a probability sufficient to undermine confidence in the outcome." *Id.*, at 2068.

In reaching that conclusion, the court said, citing *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), that the test enunciated had its roots in the test of materiality of exculpatory information not disclosed to the defense. *Agurs* represents the culmination, in the Supreme Court, of the doctrine first announced in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In *Brady,* the court held that the prosecution's suppression of evidence helpful to the defense impinged upon the defendant's due process right to a fair trial. The focus was upon the action or nonaction of the prosecution. As the case law developed, the focus of the inquiry shifted from the prosecutor's conduct to the potential harm to the defendant. The wilfulness, negligence, or ignorance of the prosecutor became unimportant. *Agurs* recognized this growth and development by stating, "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecution." *Agurs, supra,* 427 U.S. at 110, 96 S.Ct. at 2400. *Agurs* then analyzed the issue to be confronted as one of evaluating the evidence in terms of "materiality." Recognizing that the broadened scope of the *Brady* doctrine made critical the nature of the evidence rather than the reason for its nondisclosure, *Agurs* held that

[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. ... Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. ... If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor

importance might be sufficient to create a reasonable doubt.

*United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–2402, 10 L.Ed.2d 215 (1976), (footnotes omitted). It is upon this holding of *Agurs* that *Strickland* draws to define the impact of ineffectiveness of counsel.

In defining the test for prejudice, the *Strickland* court expressly disapproved of the concept that, if the error had "some conceivable effect," prejudice was shown. *Strickland, supra,* 104 S.Ct. at 2067. At the opposite end of the spectrum, the court rejected, as a valid test for prejudice, that the error "more likely than not altered the outcome of the case." *Id.,* at 2068. The test announced falls between these two extremes and appears to be an attempt to refine or restate the test of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and its progeny: that to find constitutional error harmless, it must be found to be harmless beyond a reasonable doubt. The notion of undermining "confidence in the outcome," *Strickland, supra,* 104 S.Ct. at 2068, is very close to the *Chapman* formulation. *Strickland's* restatement of the test for prejudice, "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," *Id.,* at 2069, is even closer to the *Chapman* rule. However, the *Strickland* court's failure to cite *Chapman* and the new formulation make it apparent that a different standard was intended.

It is in the context of these holdings that the failure to exploit the evidence of the passing of money to the witnesses must be considered. The analogy between the effect to be given to nondisclosed evidence and evidence not before the jury because of counsel's ineffectiveness is apparent. In both cases, the issue is the effect the evidence would have had if it had been before the jury.

In the application of the *Strickland* test to the instant case, the first step must be

an analysis of the evidence supporting the finding of guilt. There can be no question that if the inmate witnesses were to be believed, movant was guilty. Recognizing that credibility of these witnesses was the only significant issue in the case, the state commenced, as early as the voir dire of the jury, to provide a basis for credibility. Questions addressed to the jurors on voir dire were intended to determine if they knew about conditions in jails and the prisoners' antagonism to "snitches." In opening statement, the deals made with each of the witnesses were fully disclosed. The witnesses' prior inconsistent statements were disclosed by the state and the witnesses explained that fear of retribution for "snitching" motivated the lies told initially. The focus of attention on the deals made by the prisoners was adroitly shifted from one of bargained-for testimony to the removal of fear for life by removing the threat of incarceration. The state argued its right and duty to remove the threat to the witnesses by dismissing charges and permitting them to testify without fear of retribution. Given this tactic and the state's open attitude, the normal impeaching effect of the bargains struck by the witnesses was minimized. The prosecution had a lawful right to grant immunity and the basis upon which it was portrayed removed any moral revulsion associated with testimony procured in this manner.

When the evidence of the money passing to the witnesses is added to the testimony, an entirely different implication is raised as to credibility. The seeking or acceptance of cash reward for testimony is something legally and morally different from acceptance of immunity from prosecution before testimony is given.

Confidence in the outcome of the jury deliberations is weakened because this evidence of the passing of the money was not before the jury. The omitted evidence was reasonably likely to have created a reasonable doubt concerning the witnesses' credibility and thus a doubt as to movant's guilt. Upon this analysis, the ineffectiveness of counsel was prejudicial and must result in a new trial.

■ Movant also asserts on this appeal that the hearing court erred by concluding that a conviction-prone jury was not created by the exclusion of a juror, who stated an inalterable opposition to the death penalty. Because the issue will likely arise on retrial, it will be considered.

The issue implicates the holding of *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985, *modified*, March 18, 1985).[1] *Grigsby v. Mabry* holds that a jury, which is selected by excluding all jurors who hold inflexible scruples against the imposition of the death penalty, creates a conviction-prone jury in violation of the Sixth Amendment. In *Grigsby*, the death sentence imposed in a bifurcated trial before the same jury was set aside.

The issue was raised in movant's case at the trial level by motion, to limit the voir dire and to provide two separate juries. Cited in the motion to limit voir dire, were many of the studies relied upon by the Eighth Circuit in *Grigsby v. Mabry*. The denial of that motion was raised in the motion for new trial. The issue was not presented in the direct appeal.

The Rule 27.26 motion raised the issue on alternative grounds. The motion alleged that counsel was ineffective for failing to offer evidence in support of the motion and, alternatively, that the trial court's denial of the motion offended movant's Sixth Amendment right.

As the issue is stated and argued in the present appeal, the ineffectiveness of counsel claim is not urged. The thrust of the argument is directed to the rationale of *Grigsby v. Mabry*. At the time the briefs were filed and this appeal was argued, *Grigsby v. Mabry* had not been decided by the Eighth Circuit. The underlying district court opinion was available. *Grigsby v.*

---

1. *Grigsby* has been followed and its holding deemed retroactive in *Pitts v. Lockhart*, 753 F.2d 689 (8th Cir.1985); *Woodard v. Sargent*, 753 F.2d 694 (8th Cir.1985); *Ruiz v. Lockhart*, 754 F.2d 254 (8th Cir.1985); and *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.1985).

*Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983). In fact, the district court opinion was tendered as an exhibit to the hearing court in late 1983.

Movant concedes that *State v. Blair,* 638 S.W.2d 739 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983) *reh. denied,* 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472, decides the issue adversely to him. The state cites *State v. Guinan,* 665 S.W.2d 325 (Mo. banc 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984), and *State v. Preston,* 673 S.W.2d 1 (Mo. banc), *cert. denied,* —— U.S. ——, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), in addition to *Blair,* and asserts that the *Guinan* court reviewed and rejected the district court opinion in *Grigsby v. Mabry.* In this, the state is correct. *Guinan* expressly rules the question and states, in footnote 5, that the court was not unmindful of *Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983). The Supreme Court of Missouri has made it plain that they are not bound on questions of federal law by determinations of such questions in the Circuit Courts of Appeal of the United States or of the District Courts of the United States. As recently as April 2, 1985, in *Wimberly v. Labor and Indus. Relations Comm'n of Mo.,* 688 S.W.2d 344 (Mo. banc 1985), the court has reiterated that position. It deems the federal authority to be only persuasive and, in effect, has announced it was not persuaded by the district court opinion. There is no reason to believe the Eighth Circuit's affirmation of the basic principle will be any more persuasive.

This court is constitutionally bound to follow the authority of the Supreme Court of Missouri, so long as it does not conflict with constitutional doctrine announced by the Supreme Court of the United States. Movant's claim must be rejected.

*Claims of Error in the
Sentencing Process*

Movant, at trial, at sentencing, and in this Rule 27.26 proceeding, has resisted all efforts by his counsel to raise any issue with respect to the imposition of the death penalty. There can be no doubt of movant's settled intention to instruct his counsel in this area. At trial, he specifically instructed counsel that no evidence in mitigation be offered and that no argument be made in the penalty phase of the trial. This instruction was communicated to the trial judge, who conducted an extensive hearing to determine that movant was making a voluntary and informed choice to instruct his counsel not to present evidence or argument in mitigation. Movant has filed a *pro se* motion in the Rule 27.26 proceeding, denying that counsel has authority to raise these issues. At the Rule 27.26 motion hearing, movant reiterated to the judge his desire not to challenge the sentencing process.

Movant's counsel has asserted several claims of ineffectiveness of counsel in the sentencing process: failing to present argument or evidence at sentencing or at trial and stating to the jury none would be presented; failing to raise issues concerning evidence of other crimes relating to the confinement, which was the aggravating circumstance; failing to request a separate panel for punishment after evidence of other crimes was presented; failing to request instructions on presumption of innocence, of aggravating circumstances, and requiring a finding that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Movant's counsel also asserts error in the Rule 27.26 hearing by the court's finding of a knowing and voluntary waiver of counsel, predicated on the movant's direction not to present evidence and argument at the sentencing hearing. Other error related to these complaints is a claim the hearing court erred in refusing to admit expert testimony of lawyers on the issue of ineffectiveness, a claimed defect in the jury's sentencing verdict, and asserted improper proportionality review by the Supreme Court.

These claims are aggregated because a single issue is dispositive of them all. Movant's settled purpose to not raise these claims and his equally strong and unequiv-

ocal direction to counsel to refrain from action at the trial and appellate levels cannot be doubted. The question posed is the ineffectiveness of counsel in failing to take action to introduce and argue the following evidence, despite that direction. Movant's counsel at the motion hearing adduced evidence that movant attempted suicide during a previous incarceration. The circumstances need not be detailed, but the attempt appeared to be *bona fide*. There was evidence that movant made statements to a probation officer indicating an intent to commit suicide. That officer was conducting a pre-sentence investigation on the pending charges for which Trimble was in the St. Charles jail. Movant's expected sentence on those charges was 110 years. Movant also had expressed concern over being incarcerated for the crimes against children for which he had been convicted, believing that inmates in the penitentiary might threaten his safety if he were imprisoned on those charges. Movant was ultimately sentenced to 120 years on those charges. A pre-trial psychiatric report revealed movant was hospitalized for hyperactivity at age 5 or 6, and at age 9 was admitted to Malcolm Bliss Mental Health Center and was treated there for six years, until he was 15. He was then voluntarily admitted to Fulton State Hospital Youth Center and, after five months, was transferred to a maximum security unit at that institution. He was discharged in 1975 at age 16.

Movant's counsel on this appeal urges that

In criminal cases, the decisions that are to be made by the client are only three: 1.) what plea to make; 2.) whether to waive a jury trial; and 3.) whether to testify on his own behalf. A.B.A. Standards for Criminal Justice, *The Prosecution and the Defense Function*, Standard 5.2(a), pp. 237–238 (Approved Draft, 1971). *See Jones v. Barnes*, 436 [463] U.S. [745], 831, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987, 993 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93 n. 1 [97 S.Ct. 2497, 2509 n. 1, 53 L.Ed.2d 594] (1977) (Burger, C.J., concurring). All other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client, ....

Also cited is *King v. State*, 631 S.W.2d 486 (Tex.Crim.App.1982), which supports the concept that the client may not control the lawyer in the presentation of evidence in mitigation in a death penalty case. It is also argued that movant's decision amounts to a waiver of counsel that, in the circumstances, was not voluntary.

The state responds by asserting that the actions of movant's counsel have the same legal effect as cases in which third parties have attempted to prevent execution, against the wishes of the condemned prisoner. *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); *Lenhard v. Wolff*, 603 F.2d 91 (9th Cir.1979); *Clark v. Blackburn*, 524 F.Supp. 1248 (M.D.La. 1981); *Davis v. Austin*, 492 F.Supp. 273 (N.D.Ga.1980). The cited authority and the argument do not fully address the issue posed here because these cases all relate to the prisoner's choice after a trial in which the normal defense function has occurred. The cases cited relate to the question of the right of appeal. The claim in the instant case attacks the trial proceeding itself, which presents a different issue.

There can be no doubt that, as a matter of constitutional principle, the bifurcated proceeding in a death penalty scheme such as ours is intended to prevent the arbitrary and discriminatory imposition of the death penalty and is essential to the validity of the statute. In *State v. Duren*, 547 S.W.2d 476 (Mo. banc 1977), the court held unconstitutional the death penalty provisions of the then extant capital murder statute. In so holding, the court reviewed extensively *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Profitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). The court noted that these cases did not establish specific standards for the imposi-

tion of the death penalty, but reversed the various death sentence provisions in light of the principles of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and concluded that a properly drafted statute could ensure compliance with *Furman.* The *Duren* court held that the Missouri capital murder statute failed to provide a constitutionally acceptable procedure for imposition of the death penalty. The Missouri Supreme Court relied upon *Woodson* to find unconstitutional the mandatory death penalty, but quoted extensively from *Gregg,* which suggested a bifurcated system of trial, with the sentencing authority receiving (1) information relevant to sentencing and (2) standards to guide its use of the sentencing information. Within two and one-half months, the Missouri legislature passed a capital murder statute responsive to the views expressed in *Duren* as to the constitutionality of a statute which undertook to create a bifurcated system, in which the sentencing authority had both information and standards to guide it in imposing the death penalty. *State v. Moore,* 615 S.W.2d 108, 111 (Mo.App.1981); *State ex rel. Westfall v. Mason,* 594 S.W.2d 908 (Mo. banc 1980); *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981).

It is not the bifurcated proceeding that is vital. Rather, it is the information and guidance given to the sentencing authority which enables it to exercise discretion in imposing the death penalty without random, freakish, or discriminatory results. *Gregg, supra,* 428 U.S. at 153, 96 S.Ct. at 2909.

These procedures are, of course, a protection to the individual accused, but also serve an entirely separate purpose. It must be remembered that *Furman* invalidated the death penalty statutes of about 39 states and avoided the death penalty for hundreds of prisoners awaiting trial and execution under those statutes. In validating subsequently enacted statutes, the *Gregg* court stressed that a sentencing procedure, giving the jury individualized information about the defendant and guidelines for applying that information, vitiated the

random and disproportionate imposition of the death penalty, and thus avoided the constitutional attack made in *Furman.*

Essential to the Missouri statutes' application of the death penalty, is the finding by the jury that the aggravating circumstances outweigh the mitigating circumstances. The finding of an aggravating circumstance is but the threshold question. The jury must then weigh the evidence before it imposes the death penalty.

The Missouri statute thus presupposes the constitutional requirement and embodies it in the statute.

In this case, that jury function was neglected, because only movant's age was submitted in mitigation. Given the state's proof of the circumstances of the crime, the conclusion was foregone on the evidence before the jury. If the evidence had been neglected by fault of counsel, there could be little doubt that ineffectiveness would be found under the *Strickland* test. The evidence showed movant had been institutionalized for over half of his life, and the suicide attempt and his history of mental disorder might well have caused the jury to render a different verdict on the issue of punishment. It is at least reasonably likely that a different result would have been reached. It is presumed the jury follows the law and performs its proper function. *Strickland, supra,* 104 S.Ct. at 2068.

The difficulty in the case arises from the manner in which the issue is posed. Here, we have no inadvertence or neglect of counsel. Trial counsel was prepared to offer the evidence and argument, and urged his client, movant, to permit that effort. Movant was obdurate. He did not want that course pursued. Even the trial court's warning that movant's chosen course of action would, in all probability, result in the death penalty, failed to persuade him.

The issue is thus to determine trial counsel's duty in this unusual situation. The state urges that counsel had no duty to act, as the client has essential control of the case. It buttresses the argument by citing

Missouri Supreme Court Rule 4, Code of Professional Responsibility, E.C. 7–7 and 7–8, asserting these ethical canons make it plain that the decision was for the client, and the lawyer must accept the client's determination, even though contrary to the lawyer's advice. Movant's counsel asserts that ABA Standard for Criminal Justice Sec. 4–52 restricts the client's control to plea entry, jury waiver, and right to testify. The state says that the ABA Standards have not been approved, and that *State v. Thomas,* 625 S.W.2d 115 (Mo.1981), *cert. denied,* 459 U.S. 1114, 103 S.Ct. 747, 74 L.Ed.2d 966 (1983), is on all fours with the present case. In *Thomas,* the defendant directed his attorney not to present insanity or diminished capacity, a defense which counsel suggested was viable in the case. The court held an extensive hearing and counsel complied with defendant's direction. On appeal, the claim was made that counsel was ineffective. The court quoted and relied upon Missouri Supreme Court Rule 4, E.C. 7–7, holding it was not a breach of duty for the lawyer to accede to the client's demands after fully informing him of his rights. The court further held:

> While a defendant has a Sixth Amendment right to effective assistance of counsel, he may not be forced to accept this assistance if his decision to represent himself is informed and voluntary. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). Similarly, he may not be forced to accept major decisions of trial strategy if he is fully informed and voluntarily decides not to follow the advice of his lawyer. It would be absurd to say that a defendant may waive the assistance of counsel entirely and yet may not waive the benefit of counsel's advice with respect to a particular decision, such as whether or not to assert a particular defense. The Court in *Faretta* stated that the Sixth Amendment 'speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant.' *Id.* at 820, 95 S.Ct. at 2533.

*State v. Thomas, supra,* 625 S.W.2d at 124.

The state is not fully correct in asserting the ABA Standards have not been approved. In *State v. Fitzpatrick,* 676 S.W.2d 831 (Mo. banc 1984), the court cited *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), and the standards utilized therein, and upheld counsel's right to decide, independently of the client's wishes, whether to request a mistrial. The *Fitzpatrick* rationale and holding run contrary to the rationale and holding in *Moore.* These cases demonstrate the continuing difficulty in determining defense counsel's role in the criminal trial. Many cases protect counsel from claims of ineffectiveness on the ground of a tactical choice made despite the client's wishes. On the other hand, when situations such as *Moore* are presented, the courts talk in terms of waiver. Thus, the cases find no error when counsel accedes to client demand, even though the accession may not be a wise choice. On the other hand, the lawyer's choice made contrary to the client's wishes will also be approved, even where the wisdom, in hindsight, may be dubious, on the ground that counsel has control of the decisional process and must have such control to be effective. Despite pious pronouncements about the necessity for independence of counsel, *Strickland, supra,* 104 S.Ct. at 2064, the surest way to avoid a claim of ineffectiveness is to abdicate to the client's wishes, no matter how ill-advised, and to make a record. There is more than a little hint that the courts are concerned with counsel and client "sand bagging" the court with error predicated upon counsel and client agreeing upon a course of conduct which demonstrates egregious harm to the defendant. In *Lahmann v. State,* 509 S.W.2d 791 (Mo.App. 1974), the court held that a client's and counsel's joint decision for counsel to sit mute through the trial could not serve to vitiate the trial. The *Lahmann* court cited *Thomas v. State,* 475 S.W.2d 98 (Mo.1971), where counsel, with the defendant's agreement, failed to act as counsel, eschewing cross-examination, tender of evidence, and argument. The court held that, if error could be predicated upon such conduct, the

defendant and his counsel could present an absolute barrier to conviction.

■ The facts of the instant case present, in sharp relief, a conflict between the constitutional principle of *Gregg* and the principles developed to guide the application of the Sixth Amendment right to counsel. Writing upon a clean slate, the decision might be to give precedence to the principle of *Gregg*. The decisions in *Moore* and *Thomas,* however, require this court to find that counsel was not ineffective in acquiescing in the movant's desires concerning the evidence and argument at the punishment stage of the trial.

The cause is reversed and remanded to the trial court with directions to vacate the sentence and judgment and proceed with a new trial on all issues.

All concur.